**William T. CLARK, Plaintiff,**

v.

**HESS TRUCKING COMPANY,
Defendant.**

Civ. A. No. 93–1685.

United States District Court,
W.D. Pennsylvania.

Jan. 5, 1995.

Lindsay & Lutz, Lawrence P. Lutz, Butler, PA, for plaintiff.

Rhoads & Sinon, Shawn D. Lochinger, Harrisburg, PA, for defendant.

***OPINION***

and

***ORDER OF COURT***

AMBROSE, District Judge.

Plaintiff William T. Clark ("Clark") has sued his former employer, Hess Trucking, Inc. ("Hess Trucking") for violations of Title VII of the Civil Rights Acts of 1964 and 1991 and the Pennsylvania Human Relations Act arising out of his discharge from his employment at Hess Trucking. Pending before the Court is Hess Trucking's Motion for Summary Judgment on both Counts of the Complaint. For the following reasons, the Motion will be granted.

## I. *FACTUAL BACKGROUND.*

The following facts are undisputed except where noted. Defendant Hess Trucking is a trucking company with facilities or "terminals" in Hammonton, New Jersey, as well as in Harrisburg and Butler, Pennsylvania. Hess Trucking's main terminal and company headquarters is located at the facility in Harrisburg, Pennsylvania. Clark, an African–American, was hired in October 1991 as a dock supervisor at the Harrisburg terminal by Joseph Underkoffler, Vice President of Operations at Hess Trucking. Four months later, in February 1992, Underkoffler promoted Clark to be Terminal Manager of Hess Trucking's Butler terminal. Clark reported directly to Underkoffler while he was Terminal Manager.

One of Clark's duties as the Butler Terminal Manager included overseeing the petty cash fund, which had been established for day-to-day business expenses such as turnpike tolls paid by the drivers, supplies for the business, and supplying coffee and soda for the drivers. (Clark Dep. at 11.) When disbursing money from the petty cash fund, Clark was instructed to get a receipt for the disbursed funds and place the receipt in the petty cash fund, keeping the cash in a rough equilibrium of cash and receipts totalling $500.00, according to company policy. (Clark Dep. at 9, 15; Underkoffler Aff. ¶¶ 2, 6.) Clark was responsible for checking the petty cash on a daily basis, verifying that the cash and receipts totalled $500.00. (Underkoffler Exh. ¶ 7; Def.Exh. 2 at C.) Clark would periodically send the receipts to Harrisburg and would receive in return a sum of money equal to the total amount of the receipts. (Clark Dep. at 9, 15, 17; Underkoffler Aff. ¶¶ 4, 6.)

At the time Clark moved to Butler in February 1992 to assume his new position as the Butler Terminal Manager, Clark requested Underkoffler's permission to take an advance out of petty cash for personal expenses incurred in connection with his move. Underkoffler granted permission for the advance, and Clark withdrew a total of $190.00 on two occasions as an advance to cover his moving expenses. Clark submitted two handwritten notes documenting these ad-

vances and submitted these notes to the Harrisburg office along with other receipts in early March 1992. The handwritten notes submitted to Harrisburg by Clark each contained the words "advance" and "Per Joe Underkoffler." (Clark Dep. at 41; D.Reply Br., Exh. 1 and 2.) The main office accepted these notes and forwarded a check to Clark to replenish the petty cash account on March 10, 1992. (D.Reply Br., Exh. 4–8.) Clark subsequently sent two packets of receipts to Harrisburg on separate dates in July 1992, neither of which contained handwritten notes submitted by Clark for advances for personal expenses, and Clark received reimbursement checks from Harrisburg to replenish the petty cash account based upon the receipts he had submitted. Clark did not forward any petty cash receipts to Harrisburg after July of 1992.

In addition to overseeing the petty cash account, Clark was responsible for sending employee time cards to Hess Trucking's Vice President of Finance, Debra Harner. On September 9, 1992, Clark had an argument over the telephone with Harner concerning Clark's compliance with her request to send employee time cards to her by a certain date. (Clark Dep. at 38.) Harner informed Clark that Clark would not be receiving a paycheck that week because he had not submitted the time cards by the date she had requested. (Clark Dep. at 37.) During this telephone conversation, Clark called Harner a "bitch" and Harner allegedly called Clark a "black nigger" and told him to shut his "black ass mouth up" and to do what she told his "black ass to do."[1] (Clark Dep. at 33–34.) Clark claims that he immediately advised Underkoffler and William Nelson, president of Hess Trucking, both that Harner refused to issue Clark a paycheck and that Harner had used racially derogatory language towards him. (Clark Dep. at 41.) Harner was not Clark's supervisor, nor is there evidence that she had any decision making power with respect to Clark. (Clark Dep. at 33–34; Harner Aff. ¶ 3.) Harner was the only person at Hess Trucking who used racially derogatory terms to him, and the telephone conversation on September 9 constituted the only time that Harner used such terms. (Clark Dep. at 34, 42–43, 70–71.)

Sometime during late October or early November 1992, Underkoffler, Clark's supervisor, became aware of complaints that Clark was not promptly reimbursing truck drivers for tolls from the petty cash and that Clark had stated to several of the drivers that the reason for the delay was that petty cash was being "held up" at the main office in Harrisburg. (Stuble Aff. ¶ 7; Underkoffler Aff. ¶ 3; Boulanger Aff. ¶ 2; McCandless Aff. ¶ 2.) After making several inquiries, Underkoffler determined that the Harrisburg office was not "holding up" the petty cash funds; rather, Clark had not received petty cash funds from Harrisburg because he had not submitted receipts for reimbursement since July 1992. (Underkoffler Aff. ¶ 4.)

On November 20, 1992, Underkoffler travelled to Harrisburg to perform a surprise audit of the petty cash account, and the audit revealed an undocumented cash shortage of approximately $157.00. (Clark Dep. at 18–19, 21; Underkoffler Aff. ¶ 6.) When asked to account for the missing funds, Clark replied that he had paid $50.00 for carpet installation in the terminal but had forgotten to get a receipt.[2] As to the balance of the shortfall, Clark maintained that there were several receipts missing that he could not produce immediately and that, in any event, other employees working in the office should also be questioned regarding the missing funds. (Clark Dep. at 26; Clark Aff. ¶ 4.) Clark then admitted to Mr. Underkoffler that he "used a little bit of the petty cash" for his personal use without documenting

---

1. Harner and Hess Trucking deny that Harner ever used racially offensive language to Clark. However, for purposes of this motion, Hess Trucking will assume that Clark's version of the argument is true. (*See* D.Brief in Supp. of Summ.Judg. at 15.)

2. The parties apparently dispute whether Clark ever paid the carpet installer $50.00 for carpet installation, and there is some evidence indicating that the installer told Underkoffler that he never received any money from Clark. (*See* Clark Dep. at 24.) Even if we accept Clark's version as true, however, this would still leave an unexplained and undocumented shortfall of approximately $100.00 in the petty cash account.

how much he used. (Clark Dep. at 26–27; Clark Aff. ¶ 4.) Underkoffler suspended Clark immediately and subsequently notified Clark by letter that Clark was being terminated for "exercising improper control and judgment" over the petty cash account. (Underkoffler Aff. ¶ 4; *see also* Exh. 5 to Mot. Summ.Judg. ¶ 1.)

Clark contends that Hess Trucking intentionally harassed him and unlawfully terminated him because of his race, and he also contends that the reason advanced by Hess Trucking for Clark's termination is merely a pretext for the real reason, which in Clark's view was because of his race.

## II. *LEGAL STANDARD.*

 Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. Proc. 56(c). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Material, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact, and an issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Where the nonmovant will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

 Title VII prohibits employers from discharging an employee because of that employee's race. 42 U.S.C.A. § 2000e–2(a)(1) (1981). Clark has alleged that Hess Trucking intentionally discriminated against him because of his race when it fired him. Intentional discrimination cases fall within one of two categories: "pretext" and "mixed motives" cases. *Griffiths v. Cigna Corp.,* 988 F.2d 457, 468 (3d Cir.1993); *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992). "Whether a pretext or a mixed-motives case has been presented depends on the kind of circumstantial evidence the employee produces in support of [his] claim of illegal discrimination." *Hook v. Ernst & Young,* 28 F.3d 366, 374 (3d Cir. 1994). In a pretext case, an employee argues that the employer's facially legitimate reason for the adverse employment decision is false and is merely a pretext disguising its real reason for the adverse decision, *i.e.,* discrimination. A pretext case follows the familiar process set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).

 Under the pretext theory, the plaintiff has the initial burden to establish a prima facie case of employment discrimination. *Griffiths,* 988 F.2d at 469. A plaintiff establishes this prima facie case by demonstrating that he was a member of a protected class, that he was discharged from a position for which he was qualified, and that a person not within the protected class filled the position previously occupied by the plaintiff. *See St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Once the prima facie case is established, a presumption of discrimination is established and the burden is then shifted to the defendant to produce evidence establishing a legitimate non-discriminatory reason for the adverse employment action.[3] *Id.* If the defendant meets this burden of production, the presumption of discrimination drops from the case; the plaintiff must then satisfy the ultimate burden of proving discrimination by showing that the employer's

---

**3.** It is important to note that while the burden of production shifts at this point, the ultimate burden of persuasion remains at all times with the plaintiff. *Hicks,* — U.S. at —, 113 S.Ct. at 2747.

**530**

proffered explanation was not the true reason for the employment decision and that race was. *Id.*

 In a mixed motives case, on the other hand, the plaintiff's theory is based on the premise that the decision to terminate resulted from a mixture of legitimate and illegitimate reasons. Under this theory, the analysis set forth in *McDonnell Douglas/Burdine* does not apply, and the Court must instead use the analysis erected by the Supreme Court in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 246–48, 109 S.Ct. 1775, 1788–90, 104 L.Ed.2d 268 (1989). *Griffiths,* 988 F.2d at 470. Not all evidence that is probative of discrimination entitles an employee to the *Price Waterhouse* burden shifting framework. *Hook,* 28 F.3d at 373. Under the mixed motives theory, a plaintiff must present evidence substantially different from that sufficient to establish a prima facie case under a pretext theory. *Griffiths,* 988 F.2d at 470. To establish a mixed motives case, a plaintiff has the onerous burden of presenting "direct" or "overt" evidence of discrimination, meaning evidence of conduct or statements by persons in the decision-making process that directly reflects the alleged discriminatory attitude. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778–79 (3d Cir. 1994); *Griffiths,* 988 F.2d at 470. If a plaintiff satisfies this burden, the defendant must then prove that it would have made the same decision even if the forbidden consideration had played no role in the employment decision.[4] *Id.* After reviewing the evidence submitted by the parties, we find that Clark has failed to demonstrate that there is a genuine issue of material fact under either the pretext or mixed motives theory of liability.

## III. *DISCUSSION.*

### A. *Mixed Motives Theory.*

 Clark argues that because Harner was a "Vice President of Finance" at Hess Trucking, the racially offensive language Harner used during the September 9 telephone conversation constitutes direct evidence that Hess Trucking discriminated against Clark when they fired him so as to preclude summary judgment under the mixed motives theory of liability. (*See* Pl.Br. in Resp. to Def.Mot. at 15.) However,

> [s]tray remarks in the workplace ... cannot justify requiring the employer to prove that its hiring or promotion decision were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard."

*Armbruster,* 32 F.3d at 778 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J., concurring)). In this case, Clark has failed to present evidence that Harner either made the decision to terminate Clark or that she played a role or exercised any influence whatsoever over that decision. In fact, the record fails to document that Harner had any connection to employment decisions at Hess Trucking at all. Although Harner's title, "Vice President of Finance," suggests that she may have had some type of decisionmaking authority at Hess Trucking, Clark has failed to produce any evidence that the she was connected in any way to the decision to fire Clark. The statements made by Harner during the September 9 telephone call are thus insufficient to create a genuine issue of material fact under the *Price Waterhouse* mixed motives framework.

### B. *Pretext Theory.*

 The Third Circuit Court of Appeals has recently summarized the summary judgment standard for Title VII pretext cases. When the defendant answers plaintiff's prima facie case with legitimate, nondiscriminatory reasons for its action, a plaintiff may defeat summary judgment in one of two

---

4. We note that the Civil Rights Act of 1991 overruled *Price Waterhouse* to the extent it provided a complete defense to all Title VII liability. Under the 1991 Act, if an illegitimate factor such as race plays a "motivating factor" in an employment decision, and the employer proves it would have made the same decision even without the illegitimate factor, the employer can avoid "make whole" relief such as damages, back pay or reinstatement. However, the Court may still award declaratory and injunctive relief, as well as attorney's fees and costs. *See* 42 U.S.C.A. § 2000e–5(g)(2)(B) (Supp.1994).

ways: a plaintiff must either (1) present sufficient evidence "to meaningfully throw into question, i.e., to cast substantial doubt upon" the employer's proffered reason for its actions; or (2) produce sufficient evidence from which a factfinder could reasonably conclude that "an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).[5] To discredit the employer's proffered reasons, a plaintiff must establish "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' " *Fuentes,* 32 F.3d at 765. To show that an illegitimate factor was more likely than not a motivating cause of the adverse decision, a plaintiff could defeat summary judgment if he produced sufficient evidence showing that, *inter alia,* the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated similarly situated persons not of his protected class more favorably, or that the employer had previously discriminated against other members of his protected class. *Id.* This standard admittedly places a difficult burden on the plaintiff, but it is necessary to accommodate the competing interests between "the goal of discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Id.* (citing *Ezold,* 983 F.2d at 523 (3d Cir.1992)).

■ The parties do not dispute that Clark has established a prima facie case of race discrimination. Hess Trucking contends that Clark has failed to produce evidence showing that its proffered reason for firing Clark, improper management and control of the petty cash fund, was merely a pretext for some other reason, presumably race discrimination. Clark argues in response that "specified facts exist which overwhelmingly support an inference that Hess Trucking did act for discriminatory reasons," pointing to "Plaintiff's position at Hess Trucking, the approval of his use of the petty cash fund, and his treatment following Mr. [sic] Harner's remarks" as creating a genuine issue of material fact on the pretext issue. (Pl.Br.Resp. to Mot. at 18.) After reviewing all the evidence submitted by the parties, we agree with Hess Trucking that Clark has failed to satisfy his burden of producing sufficient evidence from which a reasonable factfinder could find that Hess Trucking's reason was a pretext.

■ Clark points to his affidavit as evidence that he had authority to use the petty cash for personal reasons and that he followed Underkoffler's instructions in managing the petty cash. Clark's affidavit states in relevant part:

> Prior to November 20, 1992, the company had authorized me, through Mr. Underkuffler [sic], to reimburse myself for various personal expenses with money from the petty cash account ... At no time did I remove money from the petty cash account without specific authorization from my supervisor, Joseph Underkoffler. I have never taken or stolen money from Hess Trucking, and my practices with respect to the petty cash account were authorized by Mr. Underkuffler.

(Clark Aff. ¶ 4.) We understand this affidavit to mean that not only does Clark claim he had open-ended authority to use the petty cash money for personal reasons as he did without specifically asking Underkoffler, but also that his practice of disbursing funds without obtaining a receipt for those funds or accounting in any way for the disbursed funds complied with the instructions given him by Underkoffler as to the proper control of the petty cash account. Although normally Clark's affidavit might be sufficient to establish the existence of a material issue of fact, we note that in this case the affidavit

---

5. This standard differs from the burden at trial, where a plaintiff must prove *both* that the reason was false *and* that discrimination was the real reason for the employer's action. *St. Mary's Honor Center,* ── U.S. at ──, 113 S.Ct. 2742, 2754 (1993); *see also Fuentes,* 32 F.3d at 763.

The factfinder's rejection of the employer's proffered explanation, together with the plaintiff's prima facie case, *permits,* but does not mandate, a verdict for the plaintiff. *Fuentes,* 32 F.3d at 763.

directly contradicts testimony given by Clark at his deposition months earlier:

Q Am I correct that you had not asked for or received anybody's permission to use the petty cash for your personal use?

A Right.

(Clark Dep. at 27.) Clark also testified during his deposition about the proper procedure for accounting for funds disbursed from petty cash:

Q So when petty cash was used, you were supposed to get a receipt to show what it was used for?

A Right, yes.

Q And you were supposed to keep that receipt?

A. Yes.

(Clark Dep. at 15.) In determining whether a genuine issue of material fact exists, a district court may properly disregard a non-movant's affidavit that flatly contradicts earlier deposition testimony without a satisfactory explanation. *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991). Because Clark's affidavit contradicts his earlier deposition testimony, and because there is no explanation at all for the contradictions, we will disregard the affidavit in determining whether a genuine issue of fact exists.

Clark argues in his brief that the surprise audit of the petty cash account occurring over two months after he complained to company executives about Harner's discriminatory remarks was in reality Hess Trucking's "reaction" or response to Clark's complaints. Clark apparently contends that because Underkoffler granted Clark's specific request for an advance out of the petty cash funds to cover moving expenses after his promotion, it would be reasonable to infer that Clark had open-ended discretion nine months later to use the petty cash for his own personal use, without first obtaining permission for that use and without keeping the fund in an appropriate balance of cash and receipts. Given Clark's deposition testimony and the fact that Clark has failed to dispute the circumstances leading up to the November audit (*i.e.,* the drivers' complaints and Clark's false explanation for the delay in reimbursing drivers), we find that Clark's contentions are both unreasonable and unsupported by the record evidence.

■ We recognize that proof of a discriminatory atmosphere may be relevant in proving pretext, since "such evidence does tend to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Ezold,* 983 F.2d at 546. We find, however, that the record fails to evidence a discriminatory atmosphere surrounding Clark's position at Hess Trucking. The man who fired Clark, Mr. Underkoffler, was the same man who originally hired Clark and then promoted him to the position of Butler Terminal Manager, over several qualified white applicants. Clark has pointed to no evidence in the record, except for the statements allegedly made by Harner, indicating that he was treated differently from other white employees because of his race. As for the racially derogatory statements made by Harner, even if Harner used racially discriminatory language to Clark during the September 9 telephone call, Clark concedes that was the only time such statements were made to him or in his presence. Clark does not dispute that Debra Harner was not his supervisor, and, in fact, he testified that entire weeks could go by without his having any communication at all with Harner. (Clark Dep. at 43.) In light of this, we find that Harner's statements are weak evidence at best of a discriminatory atmosphere at Hess Trucking and are insufficient to create a genuine issue as to the whether Hess Trucking's proffered reasons are "unworthy of credence."

Nor is there evidence to show that race more likely than not motivated Hess Trucking's decision to fire Clark. Although Clark did not address this in his brief, Clark asserted both in the Complaint and during his deposition that a previous employee who had similarly used petty cash funds for personal reasons was not terminated. (*See* Clark Dep. at 60–63; Complaint ¶ 8.) While evidence exists indicating that a prior assistant terminal manager, dismissed for reasons unrelated to the petty cash, had taken petty cash funds against company policy while he was employed, the record is devoid of evi-

dence showing that Underkoffler or any other decisionmaker at Hess Trucking knew of that employee's actions before he was terminated. We find that Clark has failed to demonstrate that a genuine issue of material fact exists under either method of establishing a pretext theory of Title VII liability.

### C. *Racial Harassment.*

Hess Trucking also argues that to the extent Clark states a claim for racial harassment in his Complaint, the evidence is insufficient to defeat a motion for summary judgment on that claim. Clark did not respond to the racial harassment issue in his brief. We agree with Hess Trucking that the evidence is insufficient to establish a claim for racial harassment under the standard set forth in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). For the reasons set forth in Hess Trucking's brief, and because Clark has failed to meet his burden of showing that there is a genuine issue of material fact on the racial harassment claim, summary judgment will be granted on this claim in Count I as well.

In sum, as to Clark's claim in Count I that Hess Trucking intentionally discriminated against him when they fired him, we find that Clark has provided no evidence that casts substantial doubt upon Hess Trucking's proffered reason for Clark's termination, nor is there evidence that race more likely than not played a motivating role in the decision to fire Clark, as required to defeat a motion for summary judgment under the pretext theory. There is also insufficient evidence to establish the mixed motives theory of Title VII liability. Finally, Clark has failed to show that there is a genuine issue of material fact as to his claim of racial harassment. Count I of the Complaint will accordingly be dismissed.

### IV. *PENNSYLVANIA HUMAN RELATIONS ACT.*

Count II of the Complaint alleges that Clark was the subject of racially discriminatory conduct in violation of the Pennsylvania Human Relations Act, 43 Pa.Stat. §§ 961–963 ("PHRA"). A plaintiff must exhaust all remedies and comply with all procedural requirements under the PHRA prior to seeking redress in court. *Clay v. Advanced Computer Applications*, 522 Pa. 86, 90–91, 559 A.2d 917, 919–920 (1989); *Flagg v. Control Data*, 806 F.Supp. 1218, 1221–22 (E.D.Pa.1992). One such procedural requirement is that the individual file an administrative complaint with the Pennsylvania Human Relations Commission ("Commission") within 180 days of the last discriminatory act. *See* 43 P.S. §§ 959(a), (h).

Where a plaintiff has failed to file a charge of discrimination with the Commission prior to filing suit in district court, that plaintiff is foreclosed from pursuing remedies in federal court under the PHRA. *Richardson v. Miller*, 446 F.2d 1247, 1248 (3d Cir. 1971); *Flagg*, 806 F.Supp. at 1222. The undisputed evidence demonstrates that Clark did not file a complaint with the Commission as required by the PHRA. (Clark Dep. at 31.)[6] Summary judgment will accordingly be granted on Count II of the Complaint.

---

**6.** We note that under certain circumstances, a complaint that is initially filed with the EEOC and then transmitted by the EEOC to the Commission for further processing may satisfy the filing requirements of the PHRA. *See Parsons v. Philadelphia Office of Drug & Alcohol Abuse*, 833 F.Supp. 1108, 1112 (E.D.Pa.1993); *Vincent v. Fuller Co.*, 532 Pa. 547, 616 A.2d 969, 971 (1992). In this case, however, there is no evidence that the complaint filed by Clark with the EEOC was ever transmitted to the Commission for further processing.