**Homer ROSE, Plaintiff,**

v.

**WOOLWORTH CORP., Defendant.**

**No. Civ.A. 99–6226.**

United States District Court,
E.D. Pennsylvania.

April 4, 2001.

---

George E. Walker, Philadelphia, PA, for plaintiff.

Thomas G. Servodidio, Paul D. Snitzer, Duane, Morris & Heckscher, Philadelphia, PA, for defendant.

## MEMORANDUM

JOYNER, District Judge.

This is an employment discrimination case brought by Plaintiff Homer Rose ("Plaintiff") against Defendant Venator Group, Inc. ("Venator"), formerly known as Woolworth Corporation. In his Complaint, Plaintiff alleges that Venator unlawfully discriminated against him on the basis of race and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 623, *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA"). Presently before the Court is Venator's Motion for Summary Judgment. For the reasons that follow, we will grant Venator's Motion in its entirety.

## BACKGROUND

Venator sells a variety of clothing and athletic products from approximately 5000 company-owned and operated retail stores. All told, the company employs over 40,000 employees worldwide. One of Venator's subsidiary corporations, Venator Group Corporate Services, provides information technology services throughout the company. Located in Camp Hill, Pennsylvania, this subsidiary offers technological support to various company operations such as human resources, finance, and sales. On January 29, 1997, Venator hired Plaintiff to work at the Camp Hill site as a program analyst, a position which largely entailed coding programs in a particular computer language known as Common Business Oriented Language or COBOL. Plaintiff's supervisor throughout his tenure was Ap-

plication Development Manager Joseph Mills ("Mills").

Shortly after Plaintiff began at Venator, Mills assigned him to a project for an internal client within Venator's Canadian operations ("Canadian Project"). Plaintiff's basic task was to create three CO-BOL programs that would extract sales data from a mainframe computer and configure it on a spreadsheet for the client. Plaintiff received specifications for how the programs should perform and a deadline for their completion from Jim Hoover ("Hoover"), a Venator analyst who was Plaintiff's immediate supervisor for the Canadian Project.

Unfortunately, the project deadline passed, and Plaintiff did not complete any of the three programs. (Pl.'s Dep. at 193–197; Hoover Decl. at ¶ 4). As a result, Hoover was forced to complete the programs himself, after which he informed Mills of Plaintiff's inadequate performance. (Hoover Decl. at ¶ 4). While Plaintiff admits that he did not complete the programs, he contends that he was unable to do so because he was not given necessary information and, in fact, had been removed from the project before the deadlines. (Pl.'s Dep. at 193–197; Pl.'s Resp. at 6). Plaintiff also characterizes the episode as the beginning of a "campaign to undermine" him. (Pl.'s Resp. at 5–6). Notwithstanding that characterization, Plaintiff admits that Hoover neither attempted to sabotage him, nor discriminated against him in any way. (Pl.'s Dep. at 182, 200).

Plaintiff's next major project involved creating programs to bring Venator into compliance with the Health Insurance Portability Protection Act ("HIPPA") ("HIPPA Project"). The ostensible project client was Donald Kappel, a represen-

tative of Venator's business department located in Milwaukee, Wisconsin. During the HIPPA Project, Plaintiff was directly supervised by Matt Gardner ("Gardner"), who gave Plaintiff the instructions and deadlines for his work product.

As with the Canadian Project, Plaintiff did not satisfactorily complete his work by the deadlines. Internal testing on three separate occasions over six days revealed an unacceptable error rate in Plaintiff's programs. (Gardner Dep. at 20–23, 27–30). The errors resulted in Venator missing its compliance deadline and, ultimately, necessitated use of a different program than the one Plaintiff attempted to write. (*Id.* at 30). Although Plaintiff admitted that the errors were still present in his programs after the deadline, (Pl.'s Dep. at 320–21), he argues that his failure resulted from an elaborate scheme by Mills to set him up. Plaintiff further asserts that Gardner took part in Mills' scheme by purposefully destroying Plaintiff's program, and then replacing it with one that Gardner himself had created in secret. (Pl.'s Resp. at 7–8).

Based on Plaintiff's apparent programming difficulties, Mills wrote a memorandum dated June 10, 1997 to Steve Heinmiller, Director of Corporate Systems Development, memorializing his concerns about Plaintiff's work to date. (Def.'s Ex. D–1). Two weeks later, Plaintiff received a "not meeting expectations" on his performance review by Mills. (Def.'s Ex. D–2). The review also specifically outlined Plaintiff's performance deficiencies in an attached memorandum, and informed Plaintiff that he could be subject to disciplinary action, including termination, if improvement was not shown. (Def.'s Ex. D–3).[1] Pursuant to that re-

---

1. Plaintiff refused to sign the evaluation documents because he "didn't feel they were correct." (Pl.'s Dep. at 334). In addition, Plaintiff testified that, although there was an area for employees to comment on their evaluation, he did not make any comments. (*Id.* at 333–334).

view, Mills also informed Plaintiff that he would be immediately enrolled in an in-house COBOL training course to assist him in improving his programming skills.

Despite completing the training course, Plaintiff still struggled with his work. (*See* Gardner Dep. at 34–35; Gardner Dep. Ex. 11, 12). In light of Plaintiff's continuing problems, Venator enrolled him in a second COBOL training course in Philadelphia. (Pl.'s Dep. at 354). Upon completion of the week-long training course, Plaintiff was assigned to a project headed by Dan Cale ("Cale") ("Cale Project"). The Cale Project required Plaintiff to write four COBOL programs by a set deadline. Once again, Plaintiff failed to meet his deadline. (Cale Decl. at ¶ 4). Although Plaintiff admitted that he did not complete the project, he argues that the specifications were inadequate and that he was denied access to certain helpful information. (Pl.'s Dep. at 374–75; Pl.'s Resp. at 8–9).

Following the Cale Project, Cale reported Plaintiff's poor performance to Mills. (Cale Decl. at ¶ 4). Based on that report, and Plaintiff's past failures, Mills recommended that Plaintiff be fired. Walter Sprague, Assistant Vice President of Human Resources, Heinmiller, and Cale concurred with this recommendation, (Sprague Decl. at ¶ 9), and Plaintiff consequently was terminated from Venator on October 29, 1997.

Plaintiff apparently did not raise any claims of discrimination against any party prior to his termination.[2] He now explains that he did not complain at the time because he wanted to avoid being labeled as a troublemaker. (Pl.'s Resp. at 18). Subsequent to his termination, Plaintiff dual-

filed a charge of discrimination with the Pennsylvania Human Resources Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"). After receiving his right to sue notice, he filed the instant suit on December 7, 1999. Plaintiff alleges in his Complaint that Mills subjected him to "constant and unremitting negative comments and evaluations" that were based, at least in part, on Plaintiff's race. (Compl. at ¶ 12). Although not mentioned in his Response, Plaintiff testified at his deposition that Mills made a number of racist remarks, including referring to the black community as a baby factory, (Pl.'s Dep. at 234); stating that blacks are incapable of thinking analytically, (*Id.* at 236); and warning Plaintiff not to talk to white women, (*Id.* at 242–244). In his PHRC charge and deposition, Plaintiff also makes a few tangential references to ageist comments made by Venator employees, (*see* PHRC charge at ¶ 3(b)(4); Pl.'s Dep. at 246, 327–29); however, like the alleged racist remarks, he does not raise these issues in his Response.

## DISCUSSION

### I. *Legal Standard*

A court shall grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For an issue to be "genuine," it must provide a sufficient evidentiary basis for a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**2.** In his deposition, Plaintiff stated that, while he was aware of Venator's anti-discrimination policy and procedures, he did not know whether he ever mentioned the discrimination he suffered before being fired. (Pl.'s Dep. at

384–85, 414–415). There is no affirmative indication in the record or in Plaintiff's Response that he reported any acts of discrimination to Venator while employed there.

Similarly, a factual dispute is only "material" if it has the potential of affecting the outcome of the case under the current law. *See id.* at 248, 106 S.Ct. 2505.

When construing a summary judgment motion, the court must draw all inferences and doubts in favor of the non-moving party. *See, e.g., Aman v. Cort Furniture Rental,* 85 F.3d 1074, 1080–81 (3d Cir. 1996). The non-moving party, however, may not merely rely on unsupported assertions, conclusory allegations, or suspicions. Rather, to survive summary judgment the non-moving party must create "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. 2505. Failure to do so will result in a judgment as a matter of law for the moving party "because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. *Title VII and ADEA Claims*[3]

### A. *Burden Shifting Framework*

When evaluating race discrimination claims under Title VII, courts apply the familiar burden shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This same general framework also applies with regard to claims under the ADEA.[4] With the *McDonnell Douglas* test, the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The test consists of three steps: First, the plaintiff must establish a prima facie case of discrimination. Second, once the prima facie case is established, the defendant must state a legitimate, nondiscriminatory reason for the adverse employment action. Finally, if a legitimate, non-discriminatory reason is offered, the plaintiff must come forward to show that the stated reason is not the true one, but only a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817.

In this case, Venator appears to concede that Plaintiff has made out at least a prima facie case under Title VII. Likewise, there is no serious contention that Venator has failed to forward a legitimate, non-discriminatory reason for terminating Plaintiff's employment.[5] As a result, we will focus our attention on whether Plaintiff has demonstrated that Venator's reasons for firing him were pretextual.

### B. *Pretext Analysis*

There are two ways a plaintiff can meet its burden at summary judgment with re-

---

**3.** Our analysis of Plaintiff's Title VII claims applies with equal force to Plaintiff's PHRA claims. *See, e.g., Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 317 n. 3 (3d Cir.2000).

**4.** Although the Supreme Court has not specifically held that the *McDonnell Douglas* analysis applies to ADEA claims, *see O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (assuming, without deciding, that *McDonnell Douglas* framework applies to ADEA cases), the Third Circuit has repeatedly

applied the *McDonnell Douglas* analysis in such cases, *see, e.g., Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000); *Keller v. Orix Credit Alliance,* 130 F.3d 1101 (3d Cir. 1997).

**5.** Plaintiff briefly argues that Venator failed to meet the second prong of the *McDonnell Douglas* test. (Pl.'s Resp. at 15–16). However, Plaintiff's argument simply takes issue with Mills' basis for firing Plaintiff. To the extent that Plaintiff's argument is relevant, it is properly considered under the third prong.

spect to establishing pretext. The plaintiff must point "to some evidence, direct or circumstantial, from which a fact-finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) and *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (en banc)). The first prong of the *Fuentes* test requires a plaintiff to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108–09 (3d Cir.1997). That showing requires more than just evidence that the employer's decision was wrong or misguided. *See id.* (noting that factual dispute at issue is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."). In other words, to succeed the plaintiff must demonstrate that "the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1109).

Under the second prong of the *Fuentes* test, a plaintiff can withstand summary judgment by showing that discrimination was more likely than not the motivation behind the adverse employment action. *See id.* There are a number of ways by which this burden can be met, including by showing "that the employer previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Id.* (quoting *Simpson v. Kay Jewelers,* 142 F.3d 639, 645 (3d Cir.1998)).

■ It is obvious from the record in this case that Plaintiff has failed to meet either prong under *Fuentes.* The evidence of pretext that Plaintiff provides—to the extent he provides any—can be categorized into two groups: (1) the alleged scheme by Mills and others to sabotage Plaintiff and (2) Mills' alleged racist and ageist statements. With respect to the alleged scheme to undermine him, Plaintiff argues that he was forced to endure unreasonable deadlines, insufficient information, and various acts of sabotage. (Pl.'s Resp. at 5–9). However, Plaintiff does not cite, nor can the Court locate, any evidence within the record to support these claims. At most, Plaintiff disputes the bases for his poor reviews and ultimate termination. This is insufficient to defeat summary judgment. *See Keller,* 130 F.3d at 1108–09 (explaining that factual issue is not whether employer's decision wise or prudent, but whether it was motivated by discriminatory animus); *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir.1991) (noting that fact that employee disagrees with employer's evaluation does not prove pretext), *overruled in part on other grounds, St. Mary's Honor Ctr.,* 509 U.S. at 503, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Hicks v. Arthur,* 878 F.Supp. 737, 739 (E.D.Pa. 1995) (stating that "an ill-formed decision or an ill-considered decision is not automatically pretextual if the employer gave an honest answer for termination."). Moreover, Plaintiff's position is further undermined by his own admissions that his direct supervisors did not try to sabotage him, nor were they discriminatory. (*See* Pl.'s Dep at 182, 200, 213, 220, 326). Simply put, Plaintiff fails to suggest any factu-

al basis for believing that a scheme was perpetrated against him.

With respect to Mills' alleged racist comments, Plaintiff states in his deposition and his PHRC charge—but notably, not in his Response—that Mills exhibited his racial animus through a handful of insensitive and bigoted statements. Accepting Plaintiff's version of events as true, there is still no basis for denying summary judgment. Several courts in this Circuit have found that the mere enunciation of similar statements is not sufficient to create a genuine issue of fact with regard to pretext. *See, e.g., Fitchett v. Stroehmann Bakeries, Inc.,* CIV.A. No. 95–284, 1995 WL 560028, at *5 (E.D.Pa. Sept.20, 1995); *Clark v. Hess Trucking Co.,* 879 F.Supp. 524, 532–533 (W.D.Pa.1995). Likewise, there is no evidence whatsoever that these comments were linked, temporally or otherwise, to the decision to fire Plaintiff. *See, e.g., Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *Briody v. American Gen. Fin. Co.,* No. CIV.A. 98–2728, 1999 WL 387269, at *5 n. 11 (E.D.Pa. May 28, 1999) (same, citing *Ezold*); *see also Keller,* 130 F.3d at 1111–12 (supervisor's ageist comment that was unrelated to termination, unsupported by other evidence, and made months before plaintiff's discharge was insufficient to show pretext).

In the face of documented, uncontradicted evidence of Plaintiff's repeated performance failures, Plaintiff has offered only conjecture and wholly unsupported allegations.[6] Because Plaintiff has not shown any weaknesses in Venator's proffered reasons for terminating him, nor shown that discrimination was more likely than not the motivating reason behind his termination, we will grant Venator's Motion with respect to his Title VII and ADEA discrimination claims.

### C. *Hostile Work Environment Claim*

To make out a successful hostile work environment claim, a plaintiff must establish that (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability. *Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir. 1997) (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990)). Here, granting Plaintiff every benefit of the doubt, he has failed to establish the elements above. Indeed, Plaintiff does not even address his hostile work environment claim in his Response. To the extent that Plaintiff has not abandoned this claim, it is clear that the record does not support it.

---

**6.** We pause to observe that, among Plaintiff's exhibits, is a large collection of cartoon drawings that he has labeled "Cartoon Illustration by Homer Rose." (Pl.'s Ex. B). The drawings crudely depict various types of racially insensitive behavior by employees in an office setting. In at least one such drawing, the name "Woolworth" appears. Plaintiff does not cite to this exhibit in his Response or make any other reference to it. Furthermore, Plaintiff *admits* in his deposition that these cartoons have no relevance to this case and that— contrary to the title of the exhibit—he did not draw the cartoons, but rather copied them out of a book and superimposed Defendant's name onto them. This exhibit is at best completely irrelevant and at worst a weak attempt to mislead this Court. While we will take no action with respect to this matter, Plaintiff and Plaintiff's counsel are referred to the Pennsylvania Rules of Professional Conduct and are advised that another court faced with similar conduct may not be so lenient.

Even under the most charitable view of the record before us, there is no evidence of the sort of extreme conduct that could reasonably be considered to constitute a "change in terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (noting that standards for judging hostility under Title VII will "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language ....") (internal quotations omitted); *see also Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 205 (3d Cir.2001) (noting that "Title VII is not violated by the 'mere utterance of an ... epithet which engenders offensive feelings by an employee' or by mere 'discourtesy or rudeness,' unless so severe as to constitute an objective change in the conditions of employment.") (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275). Accordingly, we will grant Defendant's Motion with respect to the hostile work environment claim.[7]

## CONCLUSION

For the foregoing reasons, we will grant Venator's Motion for Summary Judgment in its entirety. An appropriate order follows.

## *ORDER*

AND NOW, this 4th day of April, 2001, upon consideration of Defendant's Motion for Summary Judgment (Document No. 14), and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED in its entirety.

---

7. Because we will grant summary judgment in favor of Venator on all of Plaintiff's substantive claims, we need not address any issues regarding damages.